## In re NORTHERN PIGMENT CO. et al.
### Customs Appeal No. 3746.

Court of Customs and Patent Appeals.
May 23, 1934.

448

Pickrell & McDonald, of New York City (Eugene R. Pickrell, of New York City, of counsel), for appellants.

Pennie, Davis, Marvin & Edmonds, of New York City (Ernest H. Merchant, Clarence M. Fisher, of Washington, D. C., and George J. Hesselman, all of New York City, of counsel), for Magnetic Pigment Co.

Before GRAHAM, Presiding Judge, and BLAND, GARRETT, and LENROOT, Associate Judges.

BLAND, Associate Judge.

The Northern Pigment Company et al. have here appealed from the findings and recommendations made by the United States Tariff Commission pursuant to section 337, Tariff Act of 1930 (19 USCA § 1337).

Said findings and recommendations were made after an investigation was made by said Commission upon complaint of the Magnetic Pigment Company, a New York corporation, in which complaint it was alleged that Bruce Ross, Limited, a Canadian corporation of Toronto, and others, were causing to be imported into this country yellow oxide of iron pigments produced by the Northern Pigment Company, a Canadian corporation, and made by employing the method of two United States patents under which the said Magnetic Pigment Company, as exclusive licensee, had been, for ten years, manufacturing such pigments commercially in the United States.

After hearing the interested parties and making independent investigation, the said Commission made certain findings and recommendations which are set out in the margin.[1] Pending the investigation by the Tar-

---

[1] Findings.

"* * * United States patent No. 1327061 (exhibit 1) describes the process of manufacturing pigments, which process consists of immersing metallic iron in a solution of a ferrour salt, heating the solution and introducing an oxidizing agent (claim 1). Other claims describe variations of the process.

"United States patent No. 1368748 (ex-

hibit 2) describes an improvement in the above process and contains product as well as process claims. The improvement consists of the addition, or formation, of a colloidal ferric hydrate in the initial steps of oxidation. The specification declares 'This may be effected by the oxidation of colloidal ferrous hydrate precipitated from a soluble ferrous salt with lime or some other suitable alkaline agent, or by the

iff Commission which was instituted on February 24, 1933, the Commission recommended to the President that entry of certain iron compounds suitable for pigment purposes be excluded except under bond in accordance with the provisions of subdivision (f) of section 337, 19 USCA § 1337 (f). The Secretary of the Treasury, pursuant to the President's request, issued on March 8, 1933, instructions to collectors of customs in conformity with the Commission's recommendation.

With the exception of the allegation in the complaint with respect to the use by the Northern Pigment Company of the trade-mark "Norpico," which is alleged to be similar to the registered trade-mark "Mapico" of the Magnetic Pigment Company, the Commission made findings on all material allegations, all of which findings of law and fact were regarded by the Commission as being in harmony with and a justifiable basis for the recommendation for the issuance of an or-

direct precipitation of colloidal ferric hydrate from a soluble ferric salt, or the colloidal hydrate may be prepared in any other suitable manner.'

"Under those patents pigments having variances in color tones are produced. The shades of color may vary from light yellow to yellowish brown and, by calcining, burning, etc., may be made into red. Variations in shade between similar named grades of the Canadian and the domestic pigments do not indicate that either the imported or the domestic was not made in accordance with the disclosures of said patents. The imported and the domestic pigments are sold in the same channels of trade and consumed in the same industries.

"Respondents put into the record, both through counsel and witnesses, references to prior art relating to the oxidation of iron under conditions substantially the same as those set forth in the patents. These references include both prior patents and statements in various publications. The purpose of respondents in so doing was stated to be not an attack on the validity of the patents but a showing that the steps in the processes used by respondents (disclosed to the Commission partly at the hearing and partly after the hearing, the latter in confidence) were old and that therefore respondents did not use the patented process. Under the doctrine of the Bakelite Case (17 C. C. P. A. 494, 509, et seq.; certiorari denied, 282 U. S. 852, 51 S. Ct. 29, 75 L. Ed. 755; see also, Frischer & Co. v. Elting (C. C. A.) 60 F.(2d) 711; certiorari denied, 287 U. S. 649, 53 S. Ct. 96, 77 L. Ed. 561), the Commission must treat as valid certified patents which have not been declared invalid by a court of competent jurisdiction. There has been no adjudication of these patents. Two suits have been filed in United States District Courts charging infringement of patent No. 1327061. The first never came to trial and in the second a consent decree was filed, admitting the validity of the patent and enjoining infringement. There has been no litigation affecting patent No. 1368748.

"Respondents' references to prior art apparently covered every step taken under both patents, but these references do not include the combinations disclosed in those patents. The Witness Mortimer, who testified for respondents as an expert patent attorney specializing in chemical patents, asked by a Commissioner 'Are there any claims in that patent [U. S. patent No. 1327061] which you recognize as not having been disclosed before the issuance of that patent' (Transcript of Hearing, p. 384), answered broadly by stating that some courts might hold the patent valid by giving it a very narrow construction. He pointed out no feature which he thought novel.

"The Commission is of opinion that to hold respondents are entitled to use as old all the individual steps in the combinations disclosed by the patents involved would be tantamount to holding the patents invalid. Robeson Process Co. v. Robeson (D. C.) 293 F. 70, cited by respondents' counsel is not authority to the contrary. The defendant in that case did not use the process described in the patent. The decision of no infringement was therefore not based on the prior art. The use of individual steps is a different matter from the use of combinations of individual steps.

"United States Patent No. 1,327,061.

"Witness Berling, secretary-treasurer of the Northern Pigment Company (a respondent), testified that in the process of the Northern Pigment Company a ferrous sulphate solution was used, that metallic iron was immersed in the solution, that air was passed through the solution, and that the solution was heated. This process is identical with that described in United States patent No. 1327061, and particularly claim 2 thereof.

"In the Bakelite Case, supra, the Court of Customs and Patent Appeals sustained the findings of the Tariff Commission, which were in part that the importation of articles produced abroad by a method patented in the United States constituted unfair methods of competition or unfair acts in violation of section 316 of the Tar-

der of exclusion. Practically all the findings were against the contentions of the respondents. On the trade-mark question the Commission made no finding whatever.

The appeal here by the Northern Pigment Company, Limited et al., involves a great number of questions presented in nineteen assignments of error, but the controversy chiefly resolves itself into a few fundamental questions of law, which questions will be separately discussed in this opinion.

It is first contended that the action brought by the Magnetic Pigment Company was a fishing expedition; that the oxide pigments made by the Northern Pigment Company, although similar, were better than those made by the Magnetic Pigment Company in this country, and that they were made by a secret process known only to the Northern Pigment Company; and that the investigation was instituted for the purpose of discovering appellants' method.

█ The Commission found, and we think properly, that the Northern Pigment Company, in the production of the said imported oxides, used the process disclosed by certain patents to Penniman and Zoph, Nos. 1,327,-

---

iff Act of 1922 (19 USCA §§ 174–180), which section was reenacted with modifications not here pertinent as section 337 of the Tariff Act of 1930 (19 USCA § 1337). The Commission reaffirms that finding, and finds that the importation into the United States of iron oxides suitable for pigment purposes or their sale in the United States by the owner, importer, consignee, or agent of either, produced abroad by the process disclosed in United States patent No. 1327061 is an unfair method of competition or unfair act within the meaning and intent of section 337.

"Respondents contend that complainant limited the charges against the respondents to violations of product claims 7, 8, and 9 of patent No. 1368748, but that nevertheless, in the brief complainant attempted to enlarge the charges by claiming a violation of process claims in patent No. 1327061. The Commission does not so understand the facts, but in any event such action taken by a complainant in an investigation for the purposes of section 337 is not controlling of the jurisdiction of the Commission. The investigation was instituted with reference to both patents, and the hearing was held upon the question whether importations of oxides of iron suitable for pigment purposes have been made and/or whether such oxides have been sold in the United States in violation of that section. The investigation was made and a hearing was held under the Commission's rules of practice and procedure, which under the authorities have the effect of law, and which specifically state on page 9 that in such investigations the Commission is not confined to the issues presented in a complaint, but may broaden, limit, or modify the scope of an investigation. The investigation embraces unfair methods of competition or unfair acts in the importation into the United States or sale in the, United States of oxides of iron suitable for pigment purposes produced by the method or methods dis- closed in United States letters patent Nos. 1327061 and 1368748. Both patents and every claim in each are therefore involved in the investigation.

"United States Patent No. 1,368,748.

"At the hearing (on May 11, 1933) Witness Berling testified that within 'six months or a year ago' the Northern Pigment Company added lime to the starter tank. (Transcript of Hearing, p. 325.) He further stated, however, that such use of lime had been discontinued, and that the presence of gypsum in various shipments of pigments to the United States (identified as coming either from the Northern Pigment Company or Bruce Ross, Ltd.) was due to the addition of lime to the pigment after filtration, the stated purpose being to neutralize the free acid present. The Commission is unable to accept this explanation of the presence of very material amounts of gypsum in the products of the Northern Pigment Company. It is well known that metallic iron combines with sulphuric acid to form iron sulphates. In the process as employed by both the complainant ahd the respondents, metallic iron is in contact with the solutions from ten days to a month or longer. After this length of time it seems highly improbable that sufficient free acid would remain in the solutions in contact with iron to account for the amounts of gypsum found in the products of the Northern Pigment Company.

"The testimony of Witness Lofland that he can and has made by a process other than that covered by United States patents Nos. 1,327,061 and 1,368,748 an iron pigment similar in composition to the pigments produced by the Magnetic Pigment Company is immaterial. Northern Pigment Company has made no claim that it uses the Lofland process. The steps admitted by Mr. Berling in his testimony are not similar to or like those disclosed by the Lofland process as shown by United States patent No. 1,888,464. Further-

---

061 of January 6, 1920, and 1,368,748 of February 15, 1921, under which patents the Magnetic Pigment Company was the exclusive licensee for that portion of the United States east of the states of Montana, Wyoming, Colorado, and Texas. We think the record abundantly supports this conclusion. The law is settled, however, that if there is any substantial evidence which supports the findings of the Tariff Commission, its findings will not be disturbed in this court, since our jurisdiction is, by statute, expressly limited to questions of law. Frischer & Co., Inc., et al. v. Bakelite Corp. et al., 17 C. C. P. A. (Customs) 494; Id. (Cust. & Pat. App.) 39 F.(2d) 247, 257.

Both parties have, in their briefs, quoted testimony which, we think, constitutes some substantial evidence that the Northern Pigment Company, in producing the imported merchandise, employed the methods of the patents. Also, the testimony with reference to the analysis of the imported material is some substantial evidence that the material was made by the said Penniman and Zoph patented processes. Many other circumstances and facts disclosed by the record are convincing, we think, that the Northern Pig-

more, Mr. Lofland testified that to the best of his knowledge the process disclosed in his patent is not in commercial operation.

"At the hearing, Mr. Berling declined to disclose his complete process, stating that it was a valuable secret, but after the hearing submitted *in confidence* a document referred to by his counsel as a 'complete disclosure' of the process. At the request of the Tariff Commission he later submitted additional details of the use of specific materials but did not give a detailed step-by-step description as the Tariff Commission had requested. In an effort to reconcile conflicting testimony as to the process actually in use at the plant of the Northern Pigment Company, the Tariff Commission sent investigators to New Toronto. When the investigators appeared at the plant and asked permission to witness the operations and to take samples at various stages, Mr. Berling stated that he could not grant permission without consulting his 'partner,' Mr. Tiedman, who was out of town. After such consultation, Mr. Berling declined three requests made by the Commission's investigators: (1) To permit a detailed inspection of his plant; (2) to permit a limited inspection for the purpose of checking the testimony of Witness Rea that the process of the Northern Pigment Company was the same as that of the Magnetic Pigment Company; and (3) to permit the Commission's investigators to obtain samples during certain stages of the process. He gave as a reason for his declinations that compliance with any of the requests would disclose the secret steps of his process.

"The Commission's investigators made a detailed examination of the process of the Magnetic Pigment Company and found it to be the process disclosed in United States patents Nos. 1,327,061 and 1,368,748.

"The Commission finds that the Northern Pigment Company manufactures oxides of iron suitable for pigment purposes in accordance with the process described in United States patent No. 1,368,748 and that the importation into the United States or the sale in the United States by the owner, importer, consignee, or agent of either, of such iron oxides is an unfair method of competition or unfair act within the meaning and intent of section 337 (19 USCA § 1337).

"Red Pigments.

"While neither patent contains any claim specifically for the production of red oxides of iron, patent No. 1,327,061 states that the color of the oxide produced by the process there disclosed is yellow or yellowish brown and that it can be calcined or burned into a red oxide of iron if desired. Correspondence of Bruce Ross, Ltd., with persons in the United States (Exhibit 27) shows that the Northern Pigment Company intended to sell red pigments made from the yellow base, and the Commission is informed that one or more shipments have been sent to the United States. While the quantity of such importation is unknown, and to date has undoubtedly been comparatively small when compared with yellow, it is apparent that an order of exclusion limited to the hydrated type (yellow, orange, brown) may be evaded by shipments of the dehydrated (red) type. The Commission accordingly includes the dehydrated as well as the hydrated in its recommendations.

"Trade-marks.

"Petitioner charges that the Northern Pigment Company uses the trademark 'Norpico,' which is so similar to petitioner's registered trademark 'Mapico' as to create confusion in the trade, and is an infringement of the exclusive rights of petitioner under its trademark registration. While it appears that certain samples were sent from Canada to Stanley Doggett, Inc., in New York, bearing the trademark 'Norpico', the Commission has been unable to ascertain that any oxides were sold to the consuming trade under

ment Company produced its oxides, which are similar, if not identical, to those produced by the Magnetic Pigment Company, by the use of the process of said American patents.

The record shows that the president and the secretary-treasurer of the Northern Pigment Company were both formerly employed at the plant of the Synthetic Iron Color Company in California, a licensee under the Penniman and Zoph patents. Both of these individuals worked under the direction of Zoph, one of the inventors. It is shown in the record how the Northern Pigment Company in Canada was established and why. We quote from the testimony of Fred C. Berling, the secretary-treasurer of the Northern Pigment Company:

"We discussed raising capital and starting a small company to manufacture for these processes and we considered various locations. There were two licensed manufacturers on the Pacific Coast and the tonnage consumed in that territory, in view of the fact that there were two manufacturers, decided us against trying to locate on the Pacific Coast. In the East competition would also be keen, because it was covered by the Magnetic Pigment Company of Trenton. We corresponded with the Boards of Trade of various large Canadian cities, and secured data on importations of oxide of iron into Canada, and learned that most of the iron oxides used in Canada were imported, and we were able to learn about no manufacturer of yellow iron oxides or red iron oxides in Canada. We gave further consideration to Canada, because our capital was very lim-

ited and we knew that the reason—or, rather, both being employed by a plant who used the patented process, would be held against us, in the States; and there was no doubt that we would be brought into court on patent litigation, and we knew it would be impossible to build a plant and bring it into production and to defend ourselves with the small amount of capital we had available.

"So, taking everything into consideration we decided to study the situation in Canada from an economic standpoint."

■ This leads up to the second contention of appellants, to wit, that the record shows that no efficiently and economically operated United States industry is shown to have been injured or that the importation of said oxides has the tendency to destroy or substantially injure such an industry. In this connection it is urged that while the Magnetic Pigment Company is a large producer in the United States of said pigments, it is not the sole industry, and furthermore that the importation of the cheaper produced product of appellants would tend to destroy a monopoly, protect the public, and thus produce a healthy condition.

We have carefully gone into the record on this phase of the question, and we conclude that the finding in this respect by the Tariff Commission was fully justified. It was shown that owing to the location, lack of advertising expense, lack of patent royalty expense, conditions of labor, etc., the Northern Pigment Company sold, in certain quantities, its product at 4½ cents per pound, f. o. b.

---

this trademark or that the trademark was used in advertising circulars, offers for sale,' or the like. Accordingly the Commission makes no finding with regard to trademarks.

"Efficient and Economic Operation and Injury.

"Iron oxide pigments have been commercially manufactured in the United States for more than ten years under the patents involved in this investigation. Such pigments have been supplied in large quantities to the domestic market and considerable quantities have been exported.

"The Commission finds that the business is efficiently and economically operated.

"The sales of Bruce Ross, Ltd., constitute a substantial proportion of the consumption in the United States, and importation of the products of the Northern Pigment Company has the effect or tendency to render substantial injury to the domestic industry.

"Recommendations.

"The United States Tariff Commission recommends that the President direct the Secretary of the Treasury to instruct customs officers to exclude from entry into the United States the following oxides of iron suitable for pigment purposes:

"(a) Until and including January 5, 1937, any oxides of iron produced by the method or process disclosed in United States patent No. 1,327,061, except where the importation is made under license of the registered owner of said patent.

"(b) Until and including February 14, 1938, any oxides of iron produced by the method or process disclosed in United States patent No. 1,368,748, except where the importation is made under license of the registered owner of said patent.

"(c) Any of the foregoing oxides calcined or burned or processed in any other manner."

Toronto. This price was subject to a discount of 1 per cent. in ten days and must also have included a commission to Bruce Ross, Limited. The actual production cost of the product of the Magnetic Pigment Company at Trenton, N. J., in 1932, was 6.341 cents per pound. It is shown in evidence that by reason of the importation of iron oxides produced by the Northern Pigment Company and offers to sell same to the customers of the Magnetic Pigment Company at a lower price than the cost of production of the Magnetic Pigment Company, the business of the Magnetic Pigment Company during the years 1931 to 1932 was a failure. These and other facts in the record, we think, are not only some substantial evidence supporting the finding of the Commission that the importation of the pigments manufactured by the Northern Pigment Company tended to destroy or substantially injure an industry of the United States, but conclusively show this fact.

▉ Third. Before the Commission, appellants stated that they did not question the validity of the patents, but in this court they directly challenge the validity of the patents by contending that one of them is void by reason of public use of the process for more than two years prior to the application for such patent, and that both patents are void because the process steps as well as the product are old. In Frischer & Co., Inc., et al. v. Bakelite Corp. et al., supra, this court held as follows: "The second question is concerned with the right or duty of the Tariff Commission to pass upon the validity of the patents involved herein. Counsel for both the complainant and respondents proceeded upon the theory, in this court, that the Commission had a right to pass upon the same and much testimony was taken before the Commission on that question. But, whatever the concessions of counsel may be, we are clearly of opinion that it was neither the right nor the duty of the Tariff Commission to pass upon the question as to whether complainants' patents were properly issued or not."

We are of the opinion that since the validity of the patents was not a proper consideration for the Tariff Commission, it is not a proper matter for consideration here on appeal. We find nothing in the Tariff Act of 1930, or the legislative history with reference thereto, that differentiates the law applicable to this case from the law which was applicable to the predecessor provision of the Tariff Act of 1922, concerning which the above-quoted language was used.

▉ Fourth. The next question raised by the appellants is, we think, the most important one in the case and by reason of its importance it is entitled to most careful consideration. It is contended by the appellants, in substance, that before the provisions of section 337 of the Tariff Act of 1930 (19 USCA § 1337) may be applied, it is necessary for the Tariff Commission to find not only "unfair methods of competition," as that term is defined by the courts, but also "unfair acts in the importation"; that both must be found since Congress in section 337 used the conjunctive "and" instead of the word "or." It is then argued that under numerous judicial interpretations of the term "unfair methods of competition," the importation into this country of an article which could not be manufactured and sold without the consent of the inventor of the article or his licensee does not constitute unfair methods of competition. It is furthermore argued that it is not an unfair act within the meaning of that term as used in the section.

Section 337 (a) of the Tariff Act of 1930 (19 USCA § 1337 (a) reads as follows:

"Sec. 337. *Unfair practices in import trade.*

"(a) *Unfair methods of competition declared unlawful.* Unfair methods of competition *and* unfair acts in the importation of articles into the United States, or in their sale by the owner, importer, consignee, or agent of either, the effect or tendency of which is to destroy or substantially injure an industry, efficiently and economically operated, in the United States, or to prevent the establishment of such an industry, or to restrain or monopolize trade and commerce in the United States, are hereby declared unlawful, and when found by the President to exist shall be dealt with, in addition to any other provisions of law, as hereinafter provided." [Italics ours.]

This exact question has not been passed upon before, but we think both the reasoning and result of our decision in the Frischer Case, supra, are controlling of our decision here. In the Frischer Case there was involved a patent situation similar to the one at bar and also the violation of a trade-mark right. In that case we said:

"The sole remaining question for decision is whether such facts are sufficient, in law, to constitute 'unfair methods of competition and unfair acts in the importation of

454

articles into the United States, or in their sale by the owner, importer, consignee, or agent of either,' as provided in said section 316 (a), 19 USCA § 174.

"H. R. 7456, which afterwards became the Tariff Act of 1922, did not, as it passed the House of Representatives, contain the present section 316. This section was inserted by the Senate Committee on Finance and, as originally reported to the Senate, provided that the President might designate any executive department or independent establishment of the government, or both, to investigate any alleged violation and report their findings in the same to him. As the bill passed the Senate, the United States Tariff Commission was substituted as a fact finding agency 'on complaint under oath or upon the initiative of such department or independent establishment.' In conference, this section assumed the form in which it appears in the law. In reporting the bill to the Senate, the report of the Finance Committee states: 'The provision relating to unfair methods of competition in the importation of goods is broad enough to prevent every type and form of unfair practice and is, therefore, a more adequate protection to American industry than any antidumping statute the country has ever had.'

"In view of this statement, and having in mind that one of the express objects of the Tariff Act of 1922, as stated in its title, was 'to encourage the industries of the United States,' it is very obvious that it was the purpose of the law to give to industries of the United States, not only the benefit of the favorable laws and conditions to be found in this country, but also to protect such industries from being unfairly deprived of the advantage of the same and permit them to grow and develop.

"What constitutes unfair methods of competition or unfair acts is ultimately a question of law for the court and not for the Commission. Fed. Tr. Com. v. Gratz, 253 U. S. 421, 427, 40 S. Ct. 572, 64 L. Ed. 993; Standard Oil Co. v. Fed. Tr. Com. (C. C. A.) 273 F. 478, 17 A. L. R. 389; Am. Tobacco Co. v. Fed. Tr. Com. (C. C. A.) 9 F.(2d) 570; Fed. Tr. Com. v. Curtis Pub. Co., 260 U. S. 568, 580, 43 S. Ct. 210, 67 L. Ed. 408. Each case of unfair competition must be determined upon its own facts, owing to the multifarious means by which it is sought to effectuate such schemes. Fed. Tr. Com. v. Beech Nut Co., 257 U. S. 441, 453, 42 S. Ct. 150, 66 L. Ed. 307, 19 A. L. R. 882.

"The appellants were importing material which constituted an infringement of the patent rights of the complainant Bakelite Corporation. The fact that the respondents purchased the same in a foreign country where their manufacture was in accordance with law, and that they may have lawfully imported the same into this country, does not alter the case. It has been held that where a person was authorized, under the laws of Germany, to sell a certain product there, purchasers from him could not be thereby authorized to sell the articles in the United States in defiance of the rights of patentees under a United States patent. The sale of articles in the United States, under a United States patent, cannot be controlled by foreign laws. Boesch v. Graff, 133 U. S. 697, 10 S. Ct. 378, 33 L. Ed. 787.

"The same is true as to the registered trade-marks of Bakelite Corporation. The monopoly in case of a United States patent is more extensive, but there is no sufficient reason for holding that the monopoly of a trade-mark is less complete. Where imported goods were marked with a French trade-mark, it was held that they could not be sold in the United States when such mark was the same as the trade-mark of the plaintiff in the United States. Ownership of goods does not carry the right to sell them with a specific mark. Bourjois & Co. v. Katzel, 260 U. S. 689, 43 S. Ct. 244, 67 L. Ed. 464, 26 A. L. R. 567."

It seems to us that the above is quite applicable to the facts in the case at bar, with the exception of that part which relates to the registered trade-marks, since in the instant case no finding on that subject was made by the Tariff Commission.

In the Frischer Case, supra, we discussed the authorities on the "methods of unfair competition" and there pointed out the importance of "palming off" the merchandise of one person for that of another in acts of unfair competition. The "palming off" doctrine was an important element in the Frischer Case, because in that case there was evidence of such palming off.

It is well settled, we think, that unfair acts which will be enjoined by equity in the same manner as are the acts of palming off may consist of deceitful advertising which injures a competitor, bribery of employees, secret rebates and concessions, and other devices of unfair trade. See Nims, Unfair Competition and Trademarks (3d Ed.) p. 36; also, Witherow Steel Corp. v. Donner

Steel Co. (D. C.) 31 F.(2d) 157; Vortex Mfg. Co. v. Ply-Rite Contracting Co. et al. (D. C.) 33 F.(2d) 302, 313.

We are of the opinion that when Congress used the phrase, in section 337 (a) of the Tariff Act of 1930, 19 USCA § 1337 (a), "unfair methods of competition *and* unfair acts in the importation of articles into the United States," it did not intend that before such methods or acts could be stopped, the act had to fall within the technical definition of unfair methods of competition as it has been defined in some of the decisions, but we think that if unfair methods of competition or unfair acts in the importation of articles into the United States are being practiced or performed by any one, they are to be regarded as unlawful, and the section was intended to prevent them. We are furthermore of the opinion that the importation into this country of a product made without the authority of a patentee, under the process of an American patent, such as is shown in the case at bar, falls within the provision "unfair methods of competition and unfair acts in the importation of articles into the United States." In re Orion Co., 71 F.(2d) 458, 22 C. C. P. A. (Customs) ——, decided concurrently herewith.

From the case of Standard Oil Co. of Maine v. Standard Oil Co. of New York (C. C. A.) 45 F.(2d) 309, 311, we quote the following: "The law of unfair competition in trade is of comparatively recent origin and growth, Nims on Unfair Competition, § 2; but it has been and is being extended to cover all instances of fraudulent interference with another business. Courts of equity are extending the principles of equity to enjoin unfair competition in all its phases. * * *"

The following is quoted from Nims on Unfair Competition and Trade-Marks (3d Ed.) p. 36: "§ 9a. Passing off no longer a requisite of the unfair competition action. That this action has expanded in recent years cannot be doubted. It is no longer true that there is no cause of action unless passing off is present. Passing off is but one of various practices that are actionable as unfair competition. The growth has been gradual but constant. At the outset, actual passing off was enjoined. Later, although no actual passing off was proven, injunctions were issued against acts that might result in passing off, if continued. Later still, acts were enjoined which injured the plaintiff even though no passing off was present or threatened. * * *"

Further discussion of this phase of the case is not regarded as of importance here. Congress has used a broad and inclusive term, and we think the context of the provision and the purposes for which it was enacted, as shown by its legislative history, clearly indicate that the acts of the respondents, as found by the Commission, clearly fall within the term in controversy.

Fifth. It is argued at great length by appellants that in view of the fact that Congress made a special provision authorizing customs officers to stop the importation of goods, which if sold here violated American registered trade-mark rights, and made no mention there or elsewhere of the violation of a patent right, it could not have contemplated the violation of a patent right being within the purview of the term used.

We find no merit in this contention. The enforcement of the trade-mark provision was one which could easily be left to the customs officers. It could be satisfactorily handled administratively. The determination of when an unfair method of competition had been followed or an unfair act in importation had been practiced called for such investigation and fact finding as to make such a determination by the regular customs officers almost an impossibility. It is not difficult to see why Congress would not desire to thrust such a duty and responsibility upon the customs officers at the ports. In view, however, of the solicitude of Congress to protect American trade-mark rights, it would seem to follow that it would be and was also concerned with the protection of American patent rights, and we believe it intended that the section in controversy should meet this particular situation as well as other unfair acts.

This court, in the Frischer Case, quoted with approval the following finding of the Tariff Commission: "The situation presented by the manufacture in the United States of articles infringing patents is quite different from that presented by the importation of such articles made abroad. In the case of the sale of articles manufactured in the United States the infringing manufacturer can be proceeded against and thus the unfair practice be reached at its source. Domestic patentees have no effective means through the courts of preventing the sale of imported merchandise in violation of their patent rights. Customs officers are forbidden to disclose information concerning importations. Customs Regulations 1923, Articles 1131, 1323. When such merchandise

is delivered from customs custody it may be and frequently is distributed throughout the United States. The difficulties which confront a patentee seeking to enforce his rights through the courts are practically insurmountable. He is required to proceed against each individual dealer selling the infringing articles, which of course would lead to a multiplicity of suits with little likelihood that all infringing dealers could be reached. The cost of the numerous suits with the small amount of damages which may be recovered in any one suit discourages resort to the courts. Moreover, a decree obtained against one dealer would have no binding effect upon others, and by the simple expedient of changing the consignees the effect of a decree when secured would be nullified. Unless, therefore, section 316 may be invoked to reach the foreign articles at the time and place of importation by forbidding entry into the United States of those articles which upon the facts in a particular case are found to violate rights of domestic manufacturers, such domestic manufacturers have no adequate remedy."

It has long been settled that articles patented in the United States cannot be manufactured abroad, imported, and sold in violation of the rights of the patentee. Boesch v. Graff, 133 U. S. 697, 10 S. Ct. 378, 33 L. Ed. 787. In the instant case the record shows that there were a number of distributers or handlers of the Northern Pigment Company's product in competition with the product of the Magnetic Pigment Company. Upon being notified by the Magnetic Pigment Company to desist, most of them ceased such efforts, but others were found to take their places. It seems obvious that there is no adequate remedy to protect the rights of a complaining American industry, such as is shown by the record at bar, unless the provisions of the section at bar may be invoked. Moreover, the section contains this significant clause: " * * * should be dealt with, in addition to any other provision of law * * * ." No valid reason or logical basis to support the conclusion that Congress, by using both the phrase "unfair methods of competition" and "unfair acts," did not intend to cover the violation of patent rights, such as are involved here, has been suggested to us. Obviously one of the purposes of the enactment of the section, as well as the whole act, was for the encouragement of American industry. The proper application of the legislation here in controversy certainly would encourage and help a great many American industries.

It has been suggested that Congress could not have contemplated the exclusion from importation of foreign made goods upon the basis of an invalid patent, and that if the Tariff Commission and this court have no right to pass upon the validity of a patent, the result would be that lawful and proper importations could be excluded by reason of the existence of a wholly invalid patent. The courts, in many instances, have held that patents issued by the United States Patent Office will carry with them the presumption of validity. Seymour v. Osborne, 11 Wall. (78 U. S.) 516, 538, 20 L. Ed. 33; Frischer & Co., Inc., et al. v. Bakelite & Co. et al., supra. Forums have been provided where the validity of such patents may be tested. It is hardly presumable that it was intended that the Tariff Commission, a fact-finding body, should assume such a responsibility. Notwithstanding this situation, which appellants seem to think is anomalous, we conclude that Congress intended to prohibit such importations even though the validity of the patent had not been passed upon and could not be passed upon by the Tariff Commission or this court upon appeal from the Commission. Appellant speaks of the violation of the rights of American citizens. It has often been held that the importation of foreign goods is not a right but a privilege. Board of Trustees of the University of Illinois v. United States, 20 C. C. P. A. (Customs) 134, T. D. 45773; affirmed, 289 U. S. 48, 53 S. Ct. 509, 77 L. Ed. 1025.

Sixth. Appellants also contend that the section is unconstitutional for the reason that it is indefinite and leaves the determination of what are unfair methods and unfair acts to the Tariff Commission, and for the further reason that it attempts to delegate to the President judicial powers. In the Frischer Case, supra, we held that the predecessor section 316 of the Tariff Act of 1922 (19 USCA §§ 174–180) was constitutional, and cited Hampton, Jr., & Co. v. United States, 14 Cust. App. 350, T. D. 42030, affirmed, 276 U. S. 394, 48 S. Ct. 348, 72 L. Ed. 624, as supporting authority. Appellants have attempted to point out differences between the predecessor provision of the Tariff Act of 1922 and that of the Tariff Act of 1930 now under consideration. It is needless for us to go into an extended discussion of this question, since we see no merit whatever in the contention. No differences between said

provision of the Tariff Act of 1922 and that of the Tariff Act of 1930 here in controversy have been pointed out that would cause us to regard this court's holding in the Frischer Case, supra, as not controlling of the issue of constitutionality in the case at bar.

Appellants' brief contains a separate paragraph headed as follows: "This court has never hesitated to reverse its decisions when convinced error had been committed." At the end of this paragraph, certain of our decisions have been cited. As we understand it, this is a concession that the main issue involved in this case was decided in the Frischer Case, supra, and that this appeal is, in effect, for the purpose of bringing about a reversal of said decision in that respect. We have no quarrel with appellants' attempt to bring all material facts before this court with a view of avoiding the force and effect of that decision and of attempting to bring about a reversal of it if possible, and although appellants have very fully and very ably discussed the many different questions raised, we are convinced of the correctness of our conclusion and reasons in that decision and think it is for the most part controlling in this case as we have hereinbefore indicated.

We conclude that there are no errors of law in the findings of the United States Tariff Commission herein and that they should be, and are, therefore, affirmed.

Affirmed.

HATFIELD, Associate Judge, did not participate.

GARRETT, Associate Judge (specially concurring).

As in the case of In re Orion Co., decided concurrently herewith, 71 F.(2d) 458, 22 C. C. P. A. (Customs) ——, I agree that the doctrine announced by the majority in the case of In re Frischer & Co., Inc., et al. v. Bakelite Corp., 17 C. C. P. A. (Customs) 494, T. D. 43964, is controlling here.

It is true that in the Frischer & Co. Case, supra, the majority held that in addition to alleged patent infringement there were certain other acts comprising "unfair acts," while in the instant case and in the Orion Co. Case, supra, the sole act is the alleged patent infringement, but the clear implication of the Frischer & Co. decision, if not the positive holding, left no doubt as to the meaning of the majority, and to dissent upon any theory that the question was not there foreclosed would, I feel, be merely to quibble. I do not agree to all the assertions and expressions of the majority in the instant case, but, constrained by the doctrine of the Frischer & Co. Case, supra, I concur in the conclusion.