**KINIK COMPANY, Appellant,**

v.

**INTERNATIONAL TRADE COMMISSION,**
Appellee,

and

**Minnesota Mining and Manufacturing Company and Ultimate Abrasive Systems, L.L.C., Intervenors.**

No. 02–1550.

United States Court of Appeals,
Federal Circuit.

DECIDED: March 25, 2004.

Rehearing and Rehearing En Banc Denied May 13, 2004.*

* Circuit Judge SCHALL did not participate in the vote.

Anthony C. Roth, Morgan, Lewis & Bockius LLP, of Washington, DC, argued for appellant. With him on the brief were Peter Buscemi and Robert J. Hollings-head.

Michael K. Haldenstein, Attorney, Office of General Counsel, United States International Trade Commission, of Washington, DC, argued for appellee. With him on the brief were Lyn M. Schlitt, General Counsel; and James M. Lyons, Deputy General Counsel.

Ralph A. Mittelberger, Heller, Ehrman, White & McAuliffe LLP, of Washington, DC, argued for intervenors. Of counsel on the brief were Kevin H. Rhodes and Daniel R. Pastirik, 3M Innovative Properties Company, of St. Paul, MN.

Before NEWMAN, BRYSON, and LINN, Circuit Judges.

PAULINE NEWMAN, Circuit Judge.

This exclusion action was initiated on the complaint of Minnesota Mining and Manufacturing Company and Ultimate Abrasive Systems L.L.C. (collectively "3M") under 19 U.S.C. § 1337(a)(1)(B)(ii), formerly § 1337(a) of the Tariff Act of 1930 as amended (variously called § 337(a)). The International Trade Commission found that the process claimed in United States Patent No. 5,620,489 (the '489 patent), owned by 3M, was being used in Taiwan to produce certain abrasive articles that were imported by the Kinik Company into the United States.[1] We conclude that on the correct claim construction the process of the '489 patent was not practiced; the judgment of infringement is reversed.

The Commission's ruling that the defenses available under 35 U.S.C. § 271(g) do not apply to actions under 19 U.S.C. § 1337(a)(1)(B)(ii) is affirmed.

Standard of Review

■ Decisions of the International Trade Commission receive judicial review in accordance with the criteria of the Administrative Procedure Act, as set forth at 5 U.S.C. § 706(2)(E). *See* 19 U.S.C. § 1337(c); *Tanabe Seiyaku Co. v. United States Int'l Trade Comm'n*, 109 F.3d 726, 731 (Fed.Cir.1997); *Tandon Corp. v. United States Int'l Trade Comm'n*, 831 F.2d 1017, 1019 (Fed.Cir.1987).

■ Determination of the meaning and scope of patent claims is a matter of law, and receives plenary review on appeal. *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454 (Fed.Cir.1998) (en banc). Infringement of correctly construed

claims, whether literal or under the doctrine of equivalents, is a question of fact. Factual findings are reviewed under the APA to ascertain whether they are supported by substantial evidence on the record as a whole; if so, they must be sustained. *Enercon GmbH v. Int'l Trade Comm'n*, 151 F.3d 1376, 1381 (Fed.Cir. 1998). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

I

35 U.S.C. § 271(g)

■ The Commission held that the recently enacted defenses to infringement, when the issue is offshore practice of a patented process, do not apply to infringement actions before the International Trade Commission. Kinik states that this ruling is incorrect, and that all defenses to infringement are by statute available in ITC actions. Thus Kinik states that even if its process were found to include all the steps of the '489 claims, the product of those steps is "materially changed by subsequent processes," placing Kinik within the exception provided by § 271(g)(1):

> 35 U.S.C. § 271(g). Whoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer, if the importation, offer to sell, sale, or use of the product occurs during the term of such process patent. In an action for infringement of a process patent, no remedy may be granted for infringement on account of the noncommercial

---

1. *Certain Abrasive Products Made Using a Process for Making Powder Preforms, and Products Containing Same,* Inv. No. 337–TA–449, Initial Determination (Feb. 8, 2002); Final Determination (Mar. 29, 2002).

use or retail sale of a product unless there is no adequate remedy under this title for infringement on account of the importation or other use, offer to sell, or sale of that product. A product which is made by a patented process will, for purposes of this title, not be considered to be so made after—

(1) it is materially changed by subsequent processes; or

(2) it becomes a trivial and nonessential component of another product.

The Commission held that the exceptions set forth in § 271(g)(1) and (2) do not apply as defenses to § 337(a) actions. Kinik challenges this holding, pointing out that 19 U.S.C. § 1337(c) states that "[a]ll legal and equitable defenses may be presented in all cases." *See Lannom Mfg. Co. v. United States Int'l Trade Comm'n,* 799 F.2d 1572, 1578 (Fed.Cir.1986) (the Commission recognizes the same defenses and applies the same burdens of proof as in the courts). Kinik states that Congress did not create an exception for ITC actions upon enactment of § 271(g), and that the Commission incorrectly held otherwise.

The Commission relied for its interpretation on the Process Patent Amendments Act of 1988, which states, in adding § 271(g) to Title 35, that "[t]he amendments made by this subtitle shall not deprive a patent owner of any remedies available ... under section 337 of the Tariff Act of 1930, or under any other provision of law." Pub. L. 100–418, § 9006(c). The Commission held that the new defenses under § 271(g) were not intended to be available in ITC actions, for to hold otherwise would deprive the patent owner of a remedy available under the Tariff Act. The Commission pointed to the explicit statement that the existing scope of § 337 actions would not be diminished, and that § 271(g), in the clause introducing the new defenses to infringement by overseas practice, states that they are "for purposes of

this title." Such clause would have been unnecessary unless it served to avert conflict between the Patent Act and the Tariff Act, for the contemporaneous record shows that such conflict was recognized. *See Duncan v. Walker,* 533 U.S. 167, 174, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001) (it is "a cardinal principle of statutory construction" that "a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant").

The enactment of 35 U.S.C. § 271(g) was part of the Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100–418, 102 Stat. 1107. It was explained that § 271(g) was intended to provide "patent owners the new right to sue for damages and seek an injunction in Federal district court when someone, without authorization, uses or sells in the United States, or imports into the United States a product made by their patented process." S.Rep. No. 100–83 at 27 (1987). The purpose of § 271(g) was to authorize the district courts to adjudicate and impose liability for infringement based on the overseas practice of processes patented in the United States, upon importation of the products of those processes. Previously, remedy was available only by exclusion action under the Tariff Act.

Since 19 U.S.C. § 1337(c) states that all legal and equitable defenses may be presented in Commission actions, Kinik argues that the new defenses of § 271(g) apply in § 337(a) actions. However, § 9006(c) of the Process Patent Amendments Act, *supra,* states the intent to preserve all existing remedies, as elaborated in the Senate Report:

There is no intention to impose any of these limitations on owners of products or on owners of process patents in suits they are able to bring under existing

law. Neither is there any intention for these provisions to limit in any way the ability of process patent owners to obtain relief from the U.S. International Trade Commission.

S.Rep. No. 100–83 at 60–61.

The Commission ruled that the enactment of § 271(g) preserved § 337(a) undiminished by the new defenses provided for § 271(g) actions in district court. To the extent that there is any uncertainty or ambiguity in the interpretation of § 337(a) and its successor § 1337(a)(1)(B)(ii), deference must be given to the view of the agency that is charged with its administration. *Chevron U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). In *Amgen, Inc. v. United States Int'l Trade Comm'n,* 902 F.2d 1532, 1540 n. 13 (Fed.Cir.1990) this court observed that no material changes were made in the text of § 1337(a)(1)(B)(ii) as reenacted in 1988, despite the concurrent enactment of § 271(g), reinforcing the intention to preserve the scope of former § 337a. The *Amgen* court pointed out that § 271(g) expressly limited the new defenses to infringement "for purpose of this title." Although Kinik argues that it is anomalous to create a legislative distinction in the defenses available in different tribunals, before this enactment there was an even greater distinction, for overseas manufacture could not be reached at all in the district courts.

The Commission's interpretation of its statute is supported by the text of the statutes, by the legislative history, and by precedent. We affirm the Commission's ruling that the defenses established in § 271(g) are not available in § 1337(a)(1)(B)(ii) actions.

**2.** "Preform" is defined as a composition that can be shaped and holds its shape to the

## II

## INFRINGEMENT

The Volume of Binder

The '489 patent is directed to a method for the manufacture of an abrasive article by first making a soft and flexible preform[2] from a mixture containing a liquid binder, powdered matrix material, and abrasive particles, and then sintering the preform. Claim 1, the broadest claim in suit, follows:

> 1. In a method for making an abrasive article wherein a plurality of abrasive particles and a quantity of powdered sinterable matrix material are combined together and sintered to form the article, the improvement comprising forming a soft, easily deformable and flexible preform from a mixture of said quantity of powdered sinterable matrix material and a liquid binder composition, including a plurality of abrasive particles at least partially in said preform and then sintering said preform to form said abrasive article.

Kinik states that claim 1, correctly construed, is limited to preform mixtures that contain a larger volume of liquid binder composition than powdered matrix material, for that is the invention described in the specification. Kinik states that the patentee made clear that this was the invention intended to be claimed, and disclaimed mixtures other than those with an excess of liquid binder over powder. Kinik states, and the Commission found, that in the process practiced in Taiwan the volume of liquid binder is significantly less than the volume of matrix powder. However, the Commission construed the '489 claims as not limited to any ratio of liquid binder to powder.

extent needed for subsequent processing.

In the '489 specification the applicant states that in the preform mixture the volume of the liquid binder "substantially exceeds" the volume of the matrix powder. The specification does not permit a contrary construction. The Summary of the Invention states:

> To form an SEDF [soft easily deformable] preform, a slurry or paste is formed of the powdered composition and the binder composition. The concentration of powdered composition and abrasive particles (if included) in the slurry or paste is low, and the volume of the binder composition is high. In fact, the volume of the binder composition or binder phase in the mixture substantially exceeds the volume of the powdered composition and the abrasive particles.

Col. 3, lines 7–15. The ratio is quantified in the Detailed Description of the Embodiments:

> By volume, the percentage of the powder within the binder-powder mixture is usually from 1 to 5%, but it can be extended to a range of 0.3 to 10%.

Col. 3, lines 29–32. During prosecution the applicant added text to the application "to more accurately define applicant's invention" and in connection with that definition stressed that the volume of the binder composition "substantially exceeds" the volume of the metal powder, relying on this distinction to overcome cited references. Response to Office Action, at 20 (June 3, 1996) (Preliminary Amendment). The applicant stated:

> Further [the invention] is the mixture of the powdered sinterable matrix material and the liquid binder composition used to form the SEDF preform where the volume of the binder composition substantially exceeds the volume of the matrix material and in which the weight of

the binder composition is usually from 3 to 20% by weight of the mixture. *Id.*

3M stated that during prosecution it was arguing patentability in the context of the preferred embodiment, but that the invention should not be limited to use of excess binder in the preform because such limitation is not included in the claims. The Commission agreed, citing Federal Circuit precedent that limitations from the specification should not be read into the claims. The Commission cited decisions such as *Sjolund v. Musland,* 847 F.2d 1573, 1581 (Fed.Cir.1988), wherein the court explained that while claims are to be interpreted in light of the specification and with a view to ascertaining the invention, it does not follow that limitations from the specification may be read into the claims. Similarly in *Texas Instruments, Inc. v. United States Int'l Trade Comm'n,* 805 F.2d 1558, 1563 (Fed.Cir.1986), the court "cautioned against limiting the claimed invention to preferred embodiments or specific examples in the specification."

This precedent is sound. However, precedent does not hold that the claims are not limited by what is described and enabled. Patent claims are directed to the invention that is set forth in the specification. *See* 35 U.S.C. § 112 (the claims "particularly point out and distinctly claim" what the applicant views as the invention); *see also Slimfold Mfg. Co. v. Kinkead Indus., Inc.,* 810 F.2d 1113, 1116 (Fed.Cir.1987) (claims are understood in light of the specification, of which they are a part).

▇▇▇ 3M is correct in that when the specification describes the invention in broad terms, accompanied by specific examples or embodiments, the claims are generally not restricted to the specific examples or the preferred embodiments unless that scope was limited during prosecu-

tion. *See Dow Chem. Co. v. United States,* 226 F.3d 1334, 1342 (Fed.Cir.2000) (as a general rule claims of a patent are not limited to the preferred embodiment); *Intel Corp. v. United States Int'l Trade Comm'n,* 946 F.2d 821, 836 (Fed.Cir.1991) ("Where a specification does not require a limitation, that limitation should not be read from the specification into the claims.").

In the '489 patent the invention was described with specificity in the specification, and this specificity was illustrated in the examples. During prosecution the same specificity—the excess volume of liquid binder over matrix powder in the preform mixture—was emphasized as a material distinction from the prior art. The specification states that prior art preforms having low binder volume are hard, stiff, and brittle, for example at col. 1, lines 18–43, and col. 2, lines 15–19. The inventor's discussion of the disadvantages of the low binder prior art sheds light on the scope of the invention. *See Ekchian v. Home Depot, Inc.,* 104 F.3d 1299, 1304 (Fed.Cir. 1997) (arguments contained in the prosecution history which purport to distinguish an invention from the prior art may affect the scope of the patent ultimately granted). Claims cannot be construed as encompassing the prior art that was distinguished in the specification and disclaimed during prosecution. *See SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.,* 242 F.3d 1337, 1343–44 (Fed.Cir. 2001).

Even the broadest descriptive text in the '489 specification describes only mixtures where binder volume exceeds matrix powder volume. During prosecution the applicant disavowed the breadth whereby the volume of matrix powder exceeds binder volume, for a preform having low binder content was in the prior art. We have noted 3M's argument that the '489 specification states a range of weight percentages as well as relative volumes, and that the lowest weight percentage of binder mentioned (3% of the weight of the mixture) would not produce an excess volume of binder. However, that calculation, if accurate, contradicts the applicant's repeated statements that the invention is directed to mixtures having high volumes of binder. If anything, it contributes to imprecision or invalidity, not increased claim breadth.

The Commission, however, declined to review the ALJ's ruling that since the ordinary dictionary meaning of "mixture" is not limited by the proportion of the components of the mixture, the claims should not be so limited. The ALJ pointed to Federal Circuit precedent that encourages recourse to dictionaries, as in *Dow Chem. Co. v. Sumitomo Chem. Co.,* 257 F.3d 1364, 1372 (Fed.Cir.2001), and *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed.Cir.1996). The issue, however, is not one of dictionary definition of a common word, but the meaning of "mixture" as used in the patent documents. *Dow Chem.,* 257 F.3d at 1378 (scope is limited to the meaning set forth in the patent documents). The words of patent claims have the meaning and scope with which they are used in the specification and the prosecution history. *Multiform Desiccants, Inc. v. Medzam, Ltd.,* 133 F.3d 1473, 1478 (Fed.Cir.1998) ("The best source for understanding a technical term is the specification from which it arose, informed, as needed, by the prosecution history.").

The invention that was submitted for examination, and that was patented, explicitly requires an excess of liquid binder over powdered matrix. The word "mixture" in the claims has the scope given it in the specification, for it is clear that no broader scope was contemplated or intended. We conclude that the '489 claims re-

quire that the preform process employs a volume of liquid binder that exceeds the volume of powdered matrix. It is not disputed that Kinik's preform process uses a volume of liquid binder that is significantly lower than the volume of matrix powder. There was no contrary evidence on this aspect. On the correct claim construction, the judgment of violation of 19 U.S.C. § 1337(a)(1)(B)(ii) is not supported by substantial evidence, and is reversed.

The question of liability under the doctrine of equivalents was raised by 3M late in the proceedings, after discovery had closed and only one month before trial. For that reason, the ALJ refused to allow argument directed to equivalency. That aspect is not before us.

Sintering

Kinik also argues that the '489 claims cannot be infringed because they require the final step of sintering the powdered matrix, whereas the Kinik process requires brazing of the powdered matrix at a temperature higher than the sintering temperature. 3M states that "sintering" means heating the preform to a temperature just below the matrix melting point, causing the powder particles to bond together without melting. Kinik agrees with the 3M definition and argues that sintering does not characterize the Kinik process, which Kinik states passes briefly through the sintering temperature en route to the higher temperature of the Kinik process at which brazing occurs. Kinik states that any transient sintering effect is lost at the brazing temperature, and also that its product is substantially changed by brazing, raising the defense of 35 U.S.C. § 271(g)(1).

On the technologies of sintering and brazing there were disputed issues of fact and conflicting expert opinion. Both sides presented evidence concerning when sintering and brazing occur and their effect, including analysis of the preforms by scanning electron microscope at the various stages. 3M presented evidence that the Kinik process at sintering temperature produces bonding without melting as contemplated by the '489 patent, and argues that this effect is an integral part of the Kinik process, despite Kinik's final heating at brazing temperature. Kinik presented contrary evidence.

The Commission construed "sintering" to mean that "the sintered-together matrix material must retain the abrasive particles at the end of the sintering step"; that is, the matrix does not melt, but retains its shape while supporting the abrasive particles that are on the surface of the preform. The Commission found that the Kinik process requires holding the mixture for a significant period of time at the sintering temperature, before proceeding to a higher brazing temperature, and that the use of additional steps in a multi-step process does not avoid infringement, see Dow Chem., 257 F.3d at 1381; Becton Dickinson and Co. v. C.R. Bard, Inc., 922 F.2d 792, 797 (Fed.Cir.1990). Precedent indeed holds that when all the steps of a claimed process are practiced in the same way and for the same purpose as shown in the patent, the addition of further steps generally does not avoid infringement. However, both sides cite cases in which the claimed process has been supplemented in ways that have led to different conclusions as to infringement, independent of the application of § 271(g)(1). We need not resolve these issues, in view of our conclusion that infringement is avoided by a process that uses substantially lower volumes of liquid binder than of powdered matrix.

## III

## PATENT VALIDITY

Kinik states that the '489 claims are invalid if they are construed as unlim-

ited in the ratio of binder to powder in the preform mixture, on grounds of both written description and prior art. Kinik states that the prior art shows preforms containing more powder than binder, and would render obvious or anticipated claims of the breadth asserted by 3M.

The Commission held that Kinik did not raise the validity arguments in a timely fashion, for they were not included in the Joint Narrative Statement of Issues or in the prehearing briefs. *See Lannom Mfg.,* 799 F.2d at 1580 (there is no authorization to determine patent validity when that defense was not raised). Kinik argues that the issue of invalidity did not come into focus until after the ALJ's unduly broad construction of the claims in the Initial Determination, and therefore that these arguments were properly presented to the Commission in the Petition for Review.

We agree with the Commission that the omission of the issue of validity from the Joint Narrative Statement of Issues and from the prehearing briefs was in this case a waiver of challenge to validity, for it is apparent from the Statement of Issues that 3M was pressing the claim scope that Kinik now states is invalid. The Commission's treatment of the issue of patent validity is affirmed.

## CONCLUSION

The interpretation of 19 U.S.C. § 1337(a)(1)(B)(ii) with respect to 35 U.S.C. § 271(g) is affirmed. The judgment of infringement is reversed.

Each party shall bear its costs.

*AFFIRMED IN PART, REVERSED IN PART.*